UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | CRIMINAL NO.: 17-10293 |
| ) | |
| v. ) | Conspiracy |
| ) | (18 U.S.C. § 371) |
| MICHAEL BRUNO, ) | |
| ) | Criminal Forfeiture Allegation |
| Defendant. ) | (18 U.S.C. § 981(a)(1)(C) & 28 U.S.C. § 2461(c)) |

## INFORMATION

The United States Attorney charges that:

### General Allegations

At times material to this Information:

### Certain Relevant Persons and Entities

1. Defendant MICHAEL BRUNO ("BRUNO"), a resident of Melrose, Massachusetts, was a principal at an accounting firm (the "accounting firm") that provided accounting and consulting services to a large seafood processor and distributor (the "seafood processor") based in Gloucester, Massachusetts. BRUNO was also a member of the seafood processor's board of directors.

2. Jack Ventola was president of the seafood processor and owned a minority stake in the company. A seafood conglomerate based in Hong Kong controlled a majority stake in the seafood processor.

3. Co-conspirator #1 ("CC-1") was employed as head of the seafood processor's operations and reported to Ventola.

4. Co-conspirator #2 ("CC-2") was employed as a senior sales executive at the seafood processor.

5. Ventola and CC-1 were officers of Mass Labor Force, Inc., a temporary labor company registered in Massachusetts. In or about April 2000, Mass Labor Force changed its name to Continental Labor Team, Inc. ("Continental"). Mass Labor Force, and later Continental, purported to provide temporary labor to the seafood processor.

6. Ventola and CC-1 were also officers of International Freezing Systems, Inc., a company registered in Massachusetts. International Freezing Systems had no operations and no bank accounts.

7. Ventola and CC-1 were also officers of International Forces Services, Inc., a company registered in Massachusetts. International Forces Services had no operations and no bank accounts.

8. Ventola was the sole officer of Nordic Investments, LLC ("Nordic"), a company registered in the Commonwealth of Massachusetts. Nordic had no operations but maintained a bank account that was controlled by Ventola and a relative of BRUNO.

9. TP Consulting Interior Design Group, Inc. ("TP Consulting") was a company registered in the Commonwealth of Massachusetts. A relative of CC-2 was the company's sole officer. Although TP Consulting purported to provide interior design consulting services, it was, in fact, a shell company that did not render any services or derive any revenue therefrom.

10. Timatt Corp. ("Timatt") was a company registered in the Commonwealth of Massachusetts. CC-1 and a relative were the company's officers.

2

### General Allegations Regarding the Conspiracy

11. Pursuant to the Internal Revenue Code and attendant regulations, individual taxpayers generally are required to report their income, attendant tax obligations, and, where appropriate, any claim for a refund on a U.S. Individual Income Tax Return, Form 1040, which must be filed annually with the Internal Revenue Service of the United States Department of the Treasury (the "IRS").

12. S corporations are closely held companies that choose to be taxed under Subchapter S of Chapter 1 of the Internal Revenue Code. S corporations are required by law to file federal income tax returns each year but are not required to pay federal income taxes directly. Instead, they are required to report their annual gross receipts or sales, expenses, and resulting income or loss on a Form 1120-S filed with the IRS (an "S-Return"), and to pass through any income or loss to the federal tax returns filed by their shareholders. TP Consulting and Timatt were both "S" corporations.

### Objects of the Conspiracy

13. A principal purpose and object of the conspiracy was to defraud the seafood processor and its majority shareholder by diverting money from the seafood processor to Ventola, CC-1 and CC-2 via the temporary labor company.

14. Another purpose and object of the conspiracy was to defraud the United States by understating the income Ventola, CC-1 and CC-2 earned in order to avoid paying the full federal income taxes they owed, while concealing their actions from the IRS.

### Manners and Means of the Conspiracy

15. The manner and means by which BRUNO, Ventola, CC-1 and CC-2 accomplished the objects of the conspiracy included, among other things, the following:

16.     BRUNO, Ventola and CC-1 caused the seafood professor to retain Continental, purportedly to provide temporary workers for the seafood processor's facility in Gloucester, Massachusetts. At their direction, the seafood processor paid Continental a markup over the hourly wages of the temporary workers—typically sending the money to Continental via wire transfers in interstate commerce—purportedly in exchange for the services Continental rendered. In fact, however, it was employees of the seafood processor who recruited the temporary workers, handled their employment applications and otherwise dealt with issues relating to their employment.

17.     CC-1 prepared fraudulent invoices to Continental from "IFS, Inc." for work that was never performed.

18.     Ventola and CC-1 caused the checks Continental issued to IFS in payment of the fraudulent invoices to be deposited into one of Ventola's personal bank accounts, from which Ventola made regular payments to CC-1 and CC-2.

19.     Ventola, CC-1 and CC-2 did not report the income they received from Continental, via IFS, on tax returns they filed with the IRS. In Ventola's case, those returns were prepared by the accounting firm under BRUNO's supervision.

20.     Beginning in or about 2009, BRUNO and Ventola caused Continental to issue periodic payments to Nordic. Thereafter, in or about and between March and April 2010, BRUNO caused Timatt and TP Consulting to be established, and Ventola began causing Nordic to make regular payments to Timatt and TP Consulting, even though neither firm had rendered any services for those payments.

21.     BRUNO caused the accounting firm to prepare S-Returns for Timatt and TP Consulting. The S-Returns reported the payments from Nordic as income, but reduced the

4

reported income by deducting fictitious business expenses, thereby also reducing the pass-through income that CC-1 and CC-2 reported on their personal tax returns.

22. BRUNO caused the accounting firm to prepare personal tax returns for Ventola that included a Schedule C listing the purported income and expenses of Nordic. The returns improperly identified the payments to Timatt and TP Consulting as business expenses of Nordic, thereby reducing Ventola's reported income.

## Overt Acts

23. On or about various dates between approximately 1999 and 2015, BRUNO, together with Ventola, CC-1 and CC-2, committed, caused to be committed, and aided and abetted the commission of the following overt acts, among others, in furtherance of the conspiracy:

24. In or about July 1999, BRUNO and CC-1 caused a company called "State Labor Force" to be registered in the Commonwealth of Massachusetts in the name of a former employee of the seafood processor, and the seafood processor thereafter retained State Labor Force for temporary labor services, replacing Mass Labor Force.

25. In or about April 2000, BRUNO and CC-1 caused the seafood processor to terminate the services of State Labor Force and the seafood processor subsequently retained Continental—the same company that previously had been known as Mass Labor Force.

26. CC-1 provided falsified invoices in the name of "IFS, Inc." to Continental reflecting services purportedly rendered by IFS.

27. Ventola and CC-1 caused Continental's checks payable to IFS to be deposited into one of Ventola's personal bank accounts.

28. Ventola made regular payments to CC-1 and CC-2 from that account.

29. BRUNO caused the accounting firm to prepare and file personal tax returns for Ventola for each of the tax years 2006 through 2010 that failed to reflect the income Ventola had received from Continental via IFS.

30. In or about 2009, BRUNO and Ventola caused Continental to begin issuing periodic payments to Nordic.

31. In or about and between March and April 2010, BRUNO caused the formation of Timatt and TP Consulting.

32. In or about and between 2010 and 2013, Ventola caused Nordic to make regular payments to Timatt and TP Consulting, even though neither firm had rendered any services to Nordic or Ventola. The Nordic payments to TP Consulting continued at least through 2015.

33. BRUNO caused the accounting firm to prepare S-Returns for Timatt for the tax years 2010 through 2013, and for TP Consulting for the tax years 2010 through 2012. The S-returns falsely reflected the payments from Nordic as revenue and deducted fictitious business expenses from that revenue, thereby reducing the firm's reported income and with it, the pass-through income CC-1 and CC-2 reported on their personal tax returns.

34. BRUNO caused the accounting firm to prepare and file personal tax returns for Ventola for the tax years 2010 through 2013. The returns improperly identified the payments to Timatt and TP Consulting as business expenses of Nordic, thereby improperly reducing Ventola's reported income.

## The Alpine Investments Tax Fraud Scheme

35. In or about and between 2008 and 2014, Ventola received checks totaling approximately $411,927 from a seafood packaging company based in Texas (the "Texas seafood packaging company"). The checks were made payable to "Alpine Investments".

36. Ventola caused the checks to be deposited into a bank account that Ventola controlled in the name of Alpine Investments, and thereafter caused the money to be transferred from the Alpine Investments account into his personal bank accounts.

37. BRUNO caused the accounting firm to prepare personal tax returns for Ventola for the tax years 2008 through 2013 that did not report the income Ventola received from the Texas seafood packing company.

38. Ventola signed and caused to be filed the tax returns prepared by the accounting firm at BRUNO's direction, or caused them to be electronically signed and filed, falsely affirming under penalty of perjury that they were true, correct and complete to the best of his knowledge and belief, when in fact, BRUNO and Ventola both knew that the returns did not reflect the income Ventola had received from the Texas seafood packaging company.

# COUNT ONE
## (Conspiracy)

39. The United States Attorney re-alleges and incorporates by reference paragraphs 1 through 34 of this Information and further charges that:

40. In or about and between 1999 and 2015, in the District of Massachusetts and elsewhere, the defendant,

**MICHAEL BRUNO,**

together with Jack Ventola, CC-1 and CC-2, did conspire:

(a) to defraud the United States for the purpose of impeding, impairing, obstructing and defeating the lawful government functions of the IRS in the ascertainment, computation, assessment and collection of the revenue: to wit, income taxes; and

(b) to commit offenses against the United States, to wit, wire fraud, in violation of Title 18, United States Code, Section 1343, to wit: having devised and intending to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, to transmit and cause to be transmitted by means of wire communications in interstate and foreign commerce, writings, signs, signals, pictures and sounds for the purpose of executing the scheme to defraud.

41. The objectives, manner and means, and overt acts taken in furtherance of the conspiracy charged herein are set forth in paragraphs 13 through 34.

All in violation of Title 18, United States Code, Section 371.

## CRIMINAL FORFEITURE ALLEGATION
(18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c))

43. The United States Attorney re-alleges and incorporates by reference paragraphs 1 through 38 of this Information and further charges that:

44. Upon conviction of the offense charged in Count One of this Information, the defendant,

**MICHAEL BRUNO,**

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to such offense. The property to be forfeited is the following asset: $250,000 in United States currency, to be entered in the form of a forfeiture money judgment.

45. If any of the property described above, as a result of any act or omission by the defendant,

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third party;

    c. has been placed beyond the jurisdiction of the Court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be divided without difficulty,

it is the intention of the United States, pursuant to Title 28, United States Code, Section 2461(c), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the property described in paragraph 44 above.

All pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c).

                                                WILLIAM D. WEINREB
                                                Acting United States Attorney
                                                District of Massachusetts

By: _____
                STEPHEN E. FRANK
                BRIAN A. PEREZ-DAPLE
                Assistant U.S. Attorneys

Dated: September 27, 2017